Case 1:14-cv-00242 Document 29 Filed in TXSD on 02/16/16 Page 1 of 19

United States District Court
Southern District of Texas
**ENTERED**
February 16, 2016
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRACY VALDEZ GARZA, | § | |
| o/b/o E.G., Jr., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. B-14-242 |
| | § | |
| CAROLYN COLVIN, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
|     Defendant. | § | |

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the Magistrate Judge are cross-motions for summary judgment filed by Plaintiff Tracy Valdez Garza ("Garza" or "E.G.'s mother"), acting on behalf of her minor son, E.G., Jr. ("E.G."), and by the Commissioner of Social Security. Dkt. Nos. 25, 27.

Garza asks the Court to reverse or remand the decision by the Commissioner, which denied E.G.'s request for Supplemental Security Income benefits. Garza has raised two claims: (1) the Administrative Law Judge's ("ALJ") "erred by according inadequate weight to the highly supported opinion of treating physician Dr. Thurber"; and, (2) the ALJ's "credibility assessment of [Garza] should have rendered [E.G.] disabled." Dkt. No. 26.

Having reviewed the record and the pleadings, the Court concludes that the Commissioner's motion for summary judgment should be granted. There is substantial evidence to support the ALJ's findings and rationales as to both issues.

## I. Background

### A. Procedural History

On October 18, 2011, Garza, acting on behalf of E.G., applied to receive Supplemental Security Income benefits. Dkt. No. 21-3, p. 11.[1] E.G. claimed that his disability effective date was March 9, 2008, which is his date of birth. Id. On August 2, 2012, E.G.'s claim was denied. Id. On January 7, 2013, after reconsideration, E.G.'s claim

---

[1] The citation to the record refers to the Bates-stamped number on each record page.

was again denied. Id. On February 10, 2014, a hearing was held before an ALJ. Id. On June 24, 2014, the ALJ decided that E.G. was not disabled. Id. On September 18, 2014, the Appeals Council denied E.G.'s timely request for review. Id, p. 4. E.G. has sought timely review of the Commissioner's decision in this Court.

### B. Factual Context

E.G. was born in March 2008 and was six years old at the time of his hearing; his disability onset date, as noted earlier, was claimed to be at birth.

The ALJ found that E.G. suffered from "attention deficit hyperactivity disorder (ADHD), developmental delay, mixed receptive/expressive language disorder, generalized anxiety disorder, Eustachian tube dysfunction, and enuresis." Dkt. No. 21-3. These findings, generally, are undisputed. The disputed matters are: (1) whether the ALJ gave proper weight to the opinion of E.G.'s treating physician; and, (2) whether the ALJ's credibility assessment of Garza's description of E.G.'s disability was inconsistent with the ALJ's ultimate decision. Further discussion of the background is largely limited to these issues.

### C. E.G.'s Medical History

During his treatment and the disability process, E.G. was examined by multiple doctors and/or therapists. A summary of their observations and findings follows.

On September 28, 2011, E.G. was referred to rehabilitation therapy by Dr. Timothy Thurber ("Dr. Thurber") because E.G.'s speech was delayed. Dkt. No. 21-5, p. 158. On October 3, 2011, as part of his rehabilitation treatment, an ultrasound was performed on E.G. Id, p. 165. The ultrasound revealed an undescended testis. Id.

On October 7, 2011, E.G. was examined by Jessica Cuevas ("Cuevas"), a speech therapist at Mercy Kids Rehabilitation. Dkt. No. 21-5, p. 178. Cuevas noted that E.G. had suffered from "chronic ear infections which were alleviated with bilateral tubes in May 2011." Id. Cuevas also noted that E.G.'s older sister had speech and language difficulties and that E.G.'s father is deaf in one ear, possibly from a childhood experience with meningitis. Id.

Cuevas stated that E.G. had "severe disorder[s]" in auditory comprehension and

2

expressive communication. Dkt. No. 21-5, p. 179. Cuevas noted that E.G. had difficulty: following routine; identifying familiar objections; responding to simple commands; understanding "inhibitory words" – such as "wait" or "my turn"– and understanding verbs in context. Id. She also noted that E.G. had difficulty: in naming objects seen in photographs; using words instead of gestures to communicate; using plural words; combining three or four words in spontaneous speech; and, answering "what and where" questions. Id.

On that same date, E.G. was examined by Melissa Hernandez, an occupational therapist at Mercy Kids. Dkt. No. 21-5, p. 176. During the evaluation, E.G. "refused to engage in therapeutic tasks presented for evaluation." Id. He also backed "into a corner and yell[ed] and scowl[ed] at [the] therapist." Id. E.G. "grabbed a ball and raised his hand, threatening to throw [the] ball at [the] therapist." Id.

Based on interviewing Garza and observing E.G., Hernandez concluded that E.G.'s gross motor skills were in the 27 to 36 month age group – despite being nearly 43 months old. Dkt. No. 21-5, p. 176. She noted that E.G. was "able to walk downstairs alone [with] both feet on [a] step . . . able to jump on trampoline [with] an adult holding both hands . . . [and] able to stand from supine [position] and sit up." Id. Hernandez also noted that E.G. was unable to jump backwards, walk backwards or walk on his tiptoes for 10 feet. Id.

As part of the evaluation, an unidentified evaluator stated that E.G. had cognitive skills in the 22-30 month age range. Dkt. No. 21-5, p. 173. It was noted that E.G. was "able to place triangular pieces in form board, he is able to [identify] three body parts, [and] he is able to understand concept of one." E.G. was unable to: identify six body parts; paste on the appropriate side of the paper; know his own sex; know the sex of others; or name colors and shapes. Id.

On January 12, 2012, E.G. was evaluated by Dr. Miguel Petrozzi, a pediatric neurologist, after being referred by Dr. Thurber. Dkt. No. 21-5, p. 196. Dr. Petrozzi noted that E.G. was " impulsive; aggressive, loud, talkative, distracted, and does not focus." Dkt. No. 21-5, p. 196. Dr. Petrozzi further evaluated E.G. for ADHD. Id.

As part of the ADHD evaluation process, E.G.'s family members – mother, aunt,

3

uncle – as well as a family friend, who also worked as a speech and language therapist, filled out evaluation forms. Dkt. No. 21-5, pp. 204-207. All of them reported that E.G. was easily distracted; did not seem to listen when spoken to; fidgeted frequently; and had difficulty playing quietly. Id.

On January 26, 2012 – after E.G. continued to exhibit ADHD symptoms, including the inability to focus and hyperactivity – Dr. Petrozzi prescribed Methylin. Dkt. No. 21-5, pp. 187-189.

On February 14, 2012, E.G. had a follow-up visit with Dr. Petrozzi. Dkt. No. 21-5, p. 182. E.G.'s mother reported that the Methylin began working on the second day that she gave it to him and that his ADHD symptoms were getting better. Id.

On April 17, 2012, E.G. was examined by Dr. Chi D. Nguyen, an audiologist, who concluded that E.G. had age-appropriate word discrimination, which indicated that he could hear and understand words. Dkt. No. 21-5, p. 211.

On May 21, 2012, E.G. was examined by Dr. Raul R. Capitaine, a psychiatrist, for a psychiatric evaluation, after a referral by the Texas Rehabilitation Commission. Dkt. No. 21-5, p. 218. His mother reported that E.G. "interrupts a lot [] moves constantly . . . is aggressive [and] . . . fights with his mother and sister." Id. During the evaluation, E.G. "was all over the room and talked non stop." Id, p. 220. E.G. had "some difficulty counting to 10 and he has difficulty with his colors." Id, p. 220. Dr. Capitaine diagnosed E.G. as having a Global Assessment of Function score of 57.[2] Id. A score of 57 reflects "mild to moderate symptoms of impairment in [E.G.'s] overall psychological, social, and occupational functioning." Garcia v. Astrue, 293 F. App'x 243, 246 (5th Cir. 2008) (unpubl.). Dr. Capitaine opined that E.G.'s "prognosis is good, with continued treatment." Dkt. No. 21-5, p. 221.

---

[2] Global Assessment of Functioning "is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" Boyd v. Apfel, 239 F.3d 698, 700 n. 2 (5th Cir. 2001) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL at 32 (4th ed. 1994)).

On July 31, 2012, E.G. was examined again by Dr. Nguyen, who concluded that E.G. had intelligible speech and word discrimination. Dkt. No. 21-5, pp. 226-28. E.G. was diagnosed as having an impacted cerumen and eustachian tube dysfunction. Id.

On September 20, 2012, E.G. had a follow up visit with Dr. Petrozzi. Dkt. No. 21-5, p. 201. His mother reported that while on Methylin, E.G. was "calm, quiet, focused" with "better learning" and no side effects. Id.

From August 2012 until November 2013, E.G. had a total of 107 occupational therapy appointments at Kids Advanced Therapy Services ("KATS"). Dkt. No. 21-6, pp. 266-366. E.G. was always noted to be eager and/or cooperative in his sessions, but could "shut down" verbally at times. Id. On average, E.G. went to therapy about twice a week.

On December 17, 2012 – after roughly four months of occupational therapy had been completed[3] – Dr. Thurber completed a childhood disability evaluation form on behalf of E.G. Dkt. No. 21-7, p. 430. Dr. Thurber found that E.G. had "marked" limitations in attending & completing tasks, interacting and relating with others, and caring for himself. Id. Dr. Thurber found that E.G. had "less than marked" limitations in acquiring and using information and "no evidence of limitation" in moving and manipulating objects; he also found that E.G. had no limitations as to his health and physical well-being. Id.

On January 9, 2013, – after roughly five months of occupational therapy – E.G. had an occupational therapy evaluation at KATS. Dkt. No. 21-7, pp. 393-94. At 58 months old, E.G. was found to be developmentally delayed in hand-eye coordination, understanding his position in space, copying, spatial relations, visual closure, and form constancy. Id. He was also found to have poor physical coordination. Id.

E.G.'s mother reported that he had occasional accidents in his toilet usage and still needed help bathing himself. Id. E.G. was able to dress himself, but had difficulty "manipulating fasteners," such as buttons and zippers. Id. E.G. did not know his lower case

---

[3] The Court notes that there is no evidence in the record that Dr. Thurber had examined E.G. after therapy had begun before filling out the childhood disability evaluation form. See Dkt. No. 21-5, pp. 155-170 (treatment records from Dr. Thurber).

5

alphabet letters and many of them were "reversed indicating the possibility of dyslexia." Id.

On August 22, 2013, E.G. underwent another evaluation at KATS. Dkt. No. 21-7, p. 385. It was noted that E.G. had "made significant gains since date of initial evaluation, as he can now sit and attend to standardized testing which [he] could not do before due to poor self-regulation." Id. E.G. was able to write numbers, his first and last name, copy simple shapes and put his socks and shoes on, provided the latter did not have laces. Id.

On November 6, 2013 – almost a year after Dr. Thurber's evaluation and approximately three months before the disability hearing – E.G. had another evaluation at KATS. Dkt. No. 21-7, p. 379. E.G. had made "steady progress" towards his goals, showing improvement in several areas. Id, p. 381. The occupational therapist noted that E.G.'s "prognosis is good for full recovery of age appropriate skills." Id, p. 381.

On February 10, 2014, E.G.'s kindergarten teacher completed a progress report. Dkt. No. 21-4, p. 146. In that report, it was noted that E.G. was able to: identify the letters of the alphabet; differentiate and write upper and lower case letters; write his name; use numbers to describe the number of objects in a set; tell others his full name; work cooperatively in groups; and listen while others spoke – all tasks that the prior progress report indicated that he had struggled with earlier in the year. Id.

### D. State Agency Evaluations

Two state agency consultants – Dr. Lesa Walker and Dr. Michelle Chappuis – reviewed E.G.'s medical records as part of the SSI process.

#### 1. Dr. Walker

On August 1, 2012, Dr. Walker, a state agency medical consultant, reviewed E.G.'s medical records as part of a childhood disability evaluation. Dkt. No. 21-5, p. 236. Dr. Walker concluded that E.G. did not have an impairment or a combination of impairments that were the functional equivalent of a disability. Id.

Dr. Walker opined that E.G. had a marked limitation in acquiring and using information, noting that E.G. lacked focus and had an intermittent hearing problem, which was "a possible indicator of a true language impairment." Dkt. No. 21-5, p. 238.

In contrast to Dr. Thurber's opinion, Dr. Walker found that E.G. had a "less than marked" limitation in attending and completing tasks, moving and manipulating objects, and caring for himself. Id. She found that E.G. had no limitations in interacting and relating with others. Id.

### 2. Dr. Chappuis

On November 26, 2012, Dr. Chappuis, a state agency psychological consultant, reviewed E.G.'s medical records as part of a childhood disability evaluation. Dkt. No. 21-5, p. 242. Dr. Chappuis concluded that E.G. did not have an impairment or a combination of impairments that were the functional equivalent of a disability. Id.

Dr. Chappuis found that E.G. had a "less than marked" limitation in acquiring and using information as well as attending and completing tasks. Id. As to acquiring and using information, Dr. Chappuis noted that E.G. and his family were bilingual in English and Spanish, which may affect his abilities in English. Id. She noted that his verbal abilities correlated with his comprehension level, which also reduced the severity of any limitations.

Dr. Chappuis opined that E.G. had no limitations in: interacting and relating with others; moving and manipulating objects; caring for himself or in his health/physical well being. Id.

Before turning to and examining the specifics of the ALJ's decision in E.G.'s case, it is first necessary to understand the disability determination process, as it relates to childhood SSI applications.

## II. Determining Disability – The Three-Step Process

A claimant must be disabled to receive SSI benefits under Title II of the Social Security Act. 42 U.S.C. § 423(d)(1)(A). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id.

To determine whether a claimant under the age of 18 is disabled, the Commissioner is required to employ a sequential three-step process. 20 C.F.R. § 416.924. The burden of

proof lies with the claimant at each step. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n. 5 (1987). If at any stage the claimant fails to make the required showing, the evaluation process stops and the claimant is determined to not be disabled.

### 1. Step One

In the first step, the claimant must show that he or she is not currently engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). Substantial gainful activity is defined as work that involves "doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit." 20 C.F.R. § 404.1510. If the claimant is working and the work constitutes substantial gainful activity, the claimant is not disabled, "regardless of your medical condition or age, education, or work experience." 20 C.F.R. § 416.924(b).[4]

### 2. Step Two

The second step of the process requires the claimant to show that his or her impairment is medically severe. 20 C.F.R. § 404.924(c). A severe impairment is one which "significantly limits [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Unless the impairment is expected to result in death, it must have lasted – or be expected to last – for at least 12 months. 20 C.F.R. § 404.1509. If a claimant cannot show a medically severe impairment that meets the duration requirement, the claimant is not disabled under the law. 20 C.F.R. § 404.1520(c). As noted, this showing applies to both physical and mental impairments.

### 3. Step Three

At the third step, the claimant must demonstrate an impairment that is listed in Appendix 1 to 20 C.F.R. § 404.1520(p) (a "listed impairment") – or is equally severe as a listed impairment. 20 C.F.R. § 404.924(d). If the claimant can show that the impairment meets the duration requirement and is a listed impairment, then he or she is adjudged to be disabled without regard to age, education, or work experience. 20 C.F.R. § 404.924(d). If

---

[4] At the time that the ALJ held the hearing, E.G. was five years and 11 months old. It can be safely assumed that no kindergarten-age child is legally engaged in substantial gainful activity, with the possible exception of children working in Hollywood. <u>See</u> 29 U.S.C. § 212 (prohibiting the use of child labor); 29 U.S.C. § 213(c)(3) (exception for children in motion pictures or theatrical productions).

the claimant cannot show a listed impairment, the claimant is judged not to be disabled. Id.

In determining if the child has an equivalent impairment, the ALJ will consider how well the child functions in six domains: (1) acquiring and using information; (2) sttending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). In analyzing these areas, the ALJ must consider whether the applicant's performance displays "a marked limitation in two domains or an extreme limitation in one domain." Swist ex rel. Green v. Barnhart, 177 F. App'x 414, 416 (5th Cir. 2006) (unpubl.). If the applicant meets that standard, they are judged to have an equivalent impairment and are ruled to be disabled. Id.

In judging whether or not a child is impaired in these domains, the ALJ will compare the abilities of the applicant child with the expected abilities of an unimpaired a child of the same age. 20 C.F.R. § 416.926a(b).

### III. The ALJ's Decision

At step one, the ALJ found that E.G. had not engaged in substantial gainful activity. Dkt. No. 21-3, p. 23. Given the age of the child, that conclusion is clear and is not challenged.

At step two, the ALJ also found that E.G. suffered from "attention deficit hyperactivity disorder (ADHD), developmental delay, mixed receptive/expressive language disorder, generalized anxiety disorder, Eustachian tube dysfunction, and enuresis." Dkt. No. 21-3, p. 14. The ALJ found that these impairments caused "more than minimal functional limitations." Id. Again, this finding is not challenged.

At step three, the ALJ found that none of E.G.'s impairments were a listed impairment. That finding is not challenged. The ALJ then considered whether E.G.'s impairments were equivalent to a listed impairment. At that point he found that they did not. This finding is challenged and is the point of contention on appeal. Dkt. No. 26.

In reaching the conclusion, that E.G.'s impairments were not the equivalent of a listed impairment, the ALJ considered the objective medical evidence and the opinion evidence.

As relevant here, the ALJ gave "substantial weight" to Dr. Thurber's opinion "with respect to the claimant's functionality in the domains of attending and completing tasks and acquiring and using information because the objective medical evidence . . . supports it." Dkt. No. 21-3, p. 30.

On the other hand, the ALJ gave "little weight" to Dr. Thurber's opinion that E.G. "has a marked limitation in the domains of interacting and relating with others and caring for [himself] because treatment notes from Dr. Thurber himself, therapy notes, and school records do not show that the claimant is as limited as he reported." Id. The ALJ also gave "little weight" to Dr. Thurber's opinion that E.G. was not limited in the domains of moving about and manipulating objects because "the objective medical evidence and therapy notes support that the claimant is slightly more limited than Dr. Thurber determined." Id. Thus, the ALJ found that E.G. was more limited in moving and manipulating objects than Dr. Thurber had opined.

In considering whether E.G.'s impairments were the functional equivalent of a listed impairment, the ALJ considered the six factors set out in 20 C.F.R. § 416.926a(b)(1). Each of those six factors – relating to: (1) information processing, (2) task completion, (3) interacting with others, (4) interaction with objects; (5) personal care, and, (6) health and physical well-being – is addressed below.

### A. Acquiring and Using Information

The ALJ found that E.G. had a "less than marked limitation in acquiring and using information." Dkt. No. 21-3, p. 32. The ALJ noted that E.G. had shown continued improvement in this domain. Id. The ALJ observed that, in May 2012, E.G. had difficulty in counting to 10, but by the time of the hearing in February 2014, he was able to count to 100. Id. The ALJ also noted that the occupational therapist stated that E.G.'s prognosis was "good." Id.

### B. Attending and Completing Tasks

The ALJ found that E.G. had a "marked limitation in attending and completing tasks." Dkt. No. 21-3, p. 34. The ALJ noted that, even after the occupational therapy sessions had

concluded, E.G. continued to demonstrate "poor attention and hyperactive/impulsive behavior that was affecting his ability to engage at school and at home." Id.

### C. Interacting and Relating With Others

The ALJ found that E.G. had a " less than marked limitation in interacting and relating with others." Dkt. No. 21-3, p. 36. It was noted that E.G. was cooperative during his occupational therapy sessions; was able to appropriately interact with his fellow kindergarten students; is able to play with other children in his home; and, had been less physically aggressive since being prescribed Methylin. Id, pp. 36-39.

It is noted that this finding conflicts with Dr. Thurber's finding that E.G. had marked limitations in this arena.

### D. Moving About and Manipulating Objects

The ALJ found that E.G. had a "less than marked limitation in moving about and manipulating objects." Dkt. No. 21-3, p. 40. The ALJ noted that E.G.'s mother and kindergarten teacher "indicated that the claimant had no difficulties in this domain." Id.

It was also noted that E.G. was able to use the correct pencil grip and could write "from left to right across the page and from top to bottom." Id. E.G. was also able to complete puzzles independently, string beads, and properly use scissors independently. Id.

### E. Caring for Yourself

The ALJ found that E.G. had a "less than marked limitation in the ability to care for himself." Dkt. No. 21-3, p. 41. It was noted that the occupational therapist found that E.G. had a "good prognosis" for this factor. Id.

The ALJ noted that E.G. was able to recognize feelings and emotions, fed himself, put away his toys, and no longer bit himself. Id.

The finding that E.G. had less than marked limitations in this area conflicted with Dr. Thurber's opinion that E.G. had marked limitations in this arena.

### F. Health and Physical Well-Being

The ALJ found that E.G. had a " less than marked limitation in health and physical well-being." Dkt. No. 21-3, p. 43. It was noted that E.G. did not miss school, did not have

any recurring illnesses and sleeps well, but still has issues with wetting the bed. Id.

The ALJ expressly found that E.G. did not "have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning." Dkt. No. 21-3, p. 44. Accordingly, the ALJ found that E.G. was not disabled.

## IV. Applicable Law

### A. Summary Judgment

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits – if any – demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

The Fifth Circuit has stated that summary judgment "can be a problematic procedure for reviewing an appeal of disability claims under the Social Security Act." Lovett v. Schweiker, 667 F.2d 1, 2 (5th Cir. 1981). The Circuit Court explained that summary judgment can be used in such cases, so long as the district court "has adequately reviewed the record and based its judgment on a finding of substantial evidence in the administrative record." Id. Accordingly, the Court limits its review to the administrative record in this case.

### B. Standard of Review

The Court's review of the Commissioner's decision to deny disability benefits is limited to two inquiries: (1) whether the final decision is supported by "substantial evidence;" and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion." Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. Moore v. Sullivan, 919 F.2d 901, 904 (5th Cir. 1990). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). "Conflicts within

the evidence are not for the court to resolve." Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The decision by the ALJ must "stand or fall" on the rationale set forth in the ALJ's opinion. Newton v. Apfel, 209 F.3d at 455. The Court will not uphold the ALJ's decision by finding or creating a different, better, or more adequate basis. Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, 196 (1947). "Reviewing courts do not consider rationales supporting an ALJ's decision that are not invoked by the ALJ." Orr v. Commissioner of Social Security Administration, Civil No. 3:08-CV-1592-K, 2009 WL 2337793 at *9 (N.D. Tex. July 27, 2009) (citing Bagwell v. Barnhart, 338 F. Supp.2d 723, 735 (S.D. Tex. 2004)).

Furthermore, the Court generally employs a harmless error standard in reviewing administrative proceedings. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required"). The Court will not reverse a judgment unless "the substantial rights of a party have been affected." Id. (remand was not warranted when the claimant would not have been found disabled, even if the Court applied his proffered standard).

## V. Analysis

As set forth above, E.G. has raised two issues: (1) that the ALJ failed to give proper weight to the opinion of Dr. Thurber; and (2) that the ALJ, while finding E.G.'s mother to be credible, arrived at an ultimate conclusion that was at odds with the mother's hearing testimony.

The ALJ used first-hand medical evidence in determining what weight to give to Dr. Thurber's opinion. This was a permissible course of action and provides no basis for remand. Furthermore, the ALJ's ultimate conclusion – that E.G. was not disabled – was consistent with the mother's testimony. Each of these issues are addressed in turn.

### A. Dr. Thurber's Opinion

E.G. asserts that the ALJ failed to give proper weight to the opinion of Dr. Thurber – his treating physician – in determining that E.G. had less than marked limitations in

interacting and relating to others and in caring for himself. Dkt. No. 26, p. 16. This claim is not supported by the record.

The ALJ is required to give the opinion of a treating physician "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] case record." 20 C.F.R. § 416.927(c)(2). If the ALJ rejects the opinion of the treating physician, the ALJ must consider "(1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician." Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)).

The Fifth Circuit has stated that Newton requires that, "in the absence of competing first-hand medical evidence," that the ALJ consider those enumerated factors. Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003). By obvious implication, the Newton analysis is not required if the ALJ relies on competing first-hand medical evidence when rejecting the treating physician's opinion. Id; see also Alejandro v. Barnhart, 291 F.Supp.2d 497, 509-511 (S.D. Tex. 2003) (holding that Newton did not apply when the ALJ's rejection of the treating physician's opinion was based on first-hand medical evidence); Lingo v. Commissioner, 2014 WL 47341, *12 (E.D. Tex. 2014) (unpubl.) (same); Zimmerman v. Astrue, 288 Fed. App'x. 931, *3 (5th Cir. 2008) (unpubl.) (same); Ward v. Barnhart, 192 Fed. App'x. 305, 308 (5th Cir. 2006) (unpubl.).

In this case, Dr. Thurber's opinion is the only opinion given by a physician who actually treated E.G.; the other opinions came from the state agency consultants.[5] The ALJ gave Dr. Thurber's opinion "little weight" in "the domains of interacting and relating with

---

[5] SSA has asserted that Drs. Capitaine and Nguyen gave medical opinions that conflicted with Dr. Thurber's. Dkt. No. 27-1, p. 8. Those doctors examined E.G. and provided first-hand medical evidence, but they did not complete an SSA form about their opinions as to the nature of E.G.'s disabilities. Dkt. No. 21-5, pp. 208-217.

others and caring for yourself because treatment notes from Dr. Thurber himself, therapy notes, and school records do not show that the claimant is as limited as he reported." Dkt. No. 21-3, p. 30. As discussed further below, the ALJ's rejection of Dr. Thurber's opinions was based on first-hand medical evidence in the record and is supported by the record.

### 1. Interacting & Relating With Others

On December 17, 2012, Dr. Thurber gave his opinions about E.G.'s ability to interact and relate with others. Dkt. No. 21-7, p. 430. . The medical record after this date shows marked improvement by E.G. The complete record conflicts with Dr. Thurber's opinion.

The ALJ noted that throughout his occupational therapy sessions, E.G. was observed to be cooperative and many times was excited to see the therapist. Dkt. No. 21-3, p. 38. It was also noted that E.G. continued to reach new milestones in his therapy and was given a "good" prognosis. Id.

His kindergarten teacher reported that E.G. was able to "respect property and feelings of others; work cooperatively in group situations; keep hands, feet, and other objects to self; and demonstrate self-discipline." Id. During the hearing, E.G.'s mother stated that E.G. "speaks clearly enough that both familiar and unfamiliar listeners can understand him most of the time." Id, p. 39. E.G. was also able to play with other children who lived in his home. Id, p. 39.

In follow-up visits to Dr. Thurber and Dr. Petrozzi, E.G. was observed to be alert, cooperative, and obedient. Id, p. 38.

Furthermore, even before Dr. Thurber issued his opinion, E.G. had a hearing evaluation in July 2012. At that examination, E.G.'s speech was intelligible and he was able to understand words clearly. Id, p. 38.

The ALJ relied on first hand medical evidence and afforded Dr. Thurber's opinion "little weight" as to this domain. The ALJ relied on the occupational therapy evaluations and notes; the kindergarten teacher's observations; the hearing examination; and the visits to Drs. Thurber and Petrozzi. This is not a case where the ALJ rejected the treating physician's opinion and solely relied on the opinions of doctors who never examined the applicant. See

Newton, 209 F.3d at 458 (stating that in that case, the ALJ "summarily rejected the opinions of Newton's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.") (emphasis added).

The ALJ's findings as to E.G.'s ability to interact and relate to others is supported by substantial evidence and should be upheld.

### 2. Caring for Self

On December 17, 2012, Dr. Thurber gave his opinions about E.G.'s ability to care for himself. Dkt. No. 21-7, p. 430. Again, the medical record after this date shows marked improvement by E.G. Furthermore, the record conflicts with Dr. Thurber's opinion.[6]

E.G.'s occupational therapy evaluation in November 2013 showed that he had a slight developmental delay in caring for himself, but was "making steady progress towards goals" and that his "prognosis was good." Dkt. No. 21-3, p. 42. The kindergarten teacher noted that E.G. recognized feelings and emotions. Id.

At the hearing, E.G.'s mother noted that he feeds himself, gets shoes and socks and puts away his toys. Dkt. No. 21-3, p. 43. He also wants to do tasks that he cannot fully do yet, such as tying his shoes, climbing in a chair to get high objects and bathing himself, demonstrating a desire for greater independence. Id. E.G.'s mother also noted that E.G. "knows what is right/wrong and acceptable/unacceptable even though she [E.G.'s mother] claimed that [E.G.] does things that are wrong or unacceptable." Id.

The ALJ cited all of this evidence in arriving at her ultimate conclusion regarding E.G.'s ability to care for himself. The ALJ used the available medical evidence when giving Dr. Thurber's opinion little weight. Because the ALJ did not rely solely on the opinion of a non-treating physician in rejecting Dr. Thurber's opinion – and relied on the medical evidence in the record – Newton does not apply. Newton, 209 F.3d at 458. Thus, the ALJ acted properly in giving reduced weight to Dr. Thurber's opinion.

The ALJ's findings as to E.G.'s ability to care for himself is supported by substantial

---

[6] The Court notes, in passing, that Dr. Thurber's opinion may have been different if it had been rendered at the conclusion of the occupational therapy.

evidence and should be upheld.

### B. Credibility

Plaintiff asserts that the ALJ found E.G.'s mother to be "reasonably credible," but made an ultimate finding that was inconsistent with the mother's testimony. Dkt. No. 26, p. 24. This claim appears to be contrary to both the record and the ALJ's conclusions.

In making her determination, the ALJ stated that she found "the mother's complaints are reasonably credible. She does not describe that [E.G.] has limitations that are disabling." Dkt. No. 21-3, p. 31. A careful review of the record shows that the ALJ's assessment was supported by substantial evidence.

As it relates to the domain of interacting with others, E.G.'s mother assessment of her child was consistent with the ALJ's determination. At the hearing, the mother noted that E.G. was able to use words – instead of actions – to express himself and spoke clearly enough that both familiar and unfamiliar listeners would be able to understand him most of the time. Dkt. No. 21-3, p. 39. She also reported that E.G. plays with her roommates' children, who were seven and ten at the time. Id. These are all benchmarks for a child of E.G.'s age who is not disabled. 20 C.F.R. § 416.926a(i)(2)(iv).

E.G.'s mother did testify about some aspects of E.G.'s development that would tend to show that he was disabled. For example, E.G.'S mother testified that E.G. had difficulty being separated from her and that "sometimes the teacher aide has to hold him down because he will run after her [i.e., E.G.'s mother]." Dkt. No. 21-3, p. 39. E.G.'s mother also noted that sometimes E.G. will "scream, go off by himself, or hit himself." Id.

Given the totality of this testimony, the ALJ found that E.G. was less than markedly disabled. A marked disability is one that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2). In essence, the ALJ found that E.G. was, at most, moderately disabled in this domain. This finding is consistent with the mother's testimony, which reflected some difficulties, but also showed that E.G. was meeting benchmarks in other areas.

This same analysis holds true for the domain of caring for himself. A careful review of the record shows that the ALJ's assessment was supported by substantial evidence.

E.G.'s mother testified that E.G. feeds himself, wants to take care of his physical needs alone, wants to "try to do some things that he cannot fully do" yet, and knows right from wrong, and what are acceptable and unacceptable behaviors. Dkt. No. 21-3, p. 43. These are all benchmarks for an unimpaired child of E.G.'s age. 20 C.F.R. § 416.926a(k)(2)(iii)-(iv).

Again, E.G.'S mother did testify about some aspects of E.G.'s development that fell short of those benchmarks. For example, E.G. still needed assistance in clothing and bathing himself and had trouble controlling his impulses not to engage in unsafe behaviors, such as trying to cross the street without an adult. Dkt. No. 21-3, p. 43.

Given the totality of this testimony, the ALJ found that E.G. was, at most, moderately impaired. This finding is consistent with the nature of the mother's testimony.

The ALJ's assessment of the mother's credibility was consistent with her ultimate conclusions. The ALJ's credibility determinations are entitled to substantial deference. This claim should be denied.

## VI. Recommendation

WHEREFORE the Court **RECOMMENDS** that the Commissioner's motion for summary judgment be **GRANTED**. Dkt. No. 27. The Court further recommends that the Plaintiff's motion for summary judgment be **DENIED.** Dkt. No. 25.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of

plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

      DONE at Brownsville, Texas, on February 16, 2016.

                                Ronald G. Morgan
                                United States Magistrate Judge